UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER McCARTY, as Personal
Representative of the ESTATE OF GARY
McCARTY,

          Plaintiff,

v.

DAVID GATZ, BRYAN GILBERT,
NICHOLAS DYKAS, MICHAEL FRIESE,
JEFF ST. GERMAINE, AND PHILIP
ABDOO, in their individual capacities,

          Defendants.

_____/

Case No. 07-15460

Honorable Nancy G. Edmunds

**OPINION AND ORDER (1) DENYING DEFENDANTS GATZ, GILBERT, DYKAS,
FRIESE AND ST. GERMAINE'S MOTION FOR SUMMARY JUDGMENT [36] AND
(2) DENYING DEFENDANT ABDOO'S MOTION FOR SUMMARY JUDGMENT [38]**

This action, alleging excessive force in violation of the Fourth Amendment and brought

pursuant to 42 U.S.C. § 1983, comes before the Court on Defendants' motions for

summary judgment arguing that Defendants are entitled to qualified immunity.[1]   As

discussed more fully below, Defendants motions are DENIED because there are triable

issues of material fact.  When the disputed facts are viewed in the light most favorable to

the Plaintiff, Defendants used excessive force in violation of the Fourth Amendment when

(1) Clinton Township Defendants initially shot Gary McCarty while he was backing away

---

[1]Defendants David Gatz, Bryan Gilbert, Nicholas Dykas, Michael Friese, and Jeff St.
Germaine are all Clinton Township police officers and are collectively referenced here as
"Clinton Township Defendants."  Defendant Philip Abdoo is a Sergeant with the Macomb
County Sheriff's Department (Abdoo Dep. at 4) and is referenced here as Defendant
Abdoo.

from Defendants with his hands up in the air over his head; (2) Clinton Township Defendants continued to shoot McCarty while he was laying, face down, on the ground after being initially shot numerous times; and (3) Defendant Abdoo tasered McCarty two times while he lay face down on the ground after being shot multiple times.  Moreover, the Fourth Amendment rights at issue here were clearly established at the time of Defendants' alleged misconduct.

I.   **Facts**

   **A.  Armed Robbery Reported, Police Chase Ending at Farmer's Market**

There is no dispute that decedent Gary McCarty ("McCarty") was shot and killed, that each of the Clinton Township Defendants shot at McCarty numerous times, and that Defendant Abdoo tasered him twice after he had been shot.  It was subsequently discovered, after the shooting and tasering, that McCarty had an airgun; not a real gun. (Friese Dep. at 69-70.)

On January 27, 2007, shortly after 12:00 a.m., the Clinton Township Police Department received a report of an armed robbery of a Passport Pizza, located on Groesbeck in Clinton Township.  The robbery was reported by the store's manager, David Novak, who testified that McCarty pointed what looked like a gun in his face, demanded money, and backed out of the store after taking the money.   Novak saw McCarty drive away in a purple PT Cruiser (Novak Dep. at 7-13, 20-22, 28-29).  Clinton Township Defendants were working the midnight shift and learned of the report of an armed robbery and proceeded immediately to their police cars to respond to the call.  (Gatz Dep. at 33; Gilbert Dep. at 15; Dykas Dep. at 8; Friese Dep. at 82, 84-85; St. Germaine Dep. at 18-19, 26-28.)   Defendant Dykas was alone in a car.   Defendants Friese and Gilbert were

2

assigned to a squad car together, with Friese driving. Defendants Gatz and St. Germaine were assigned to a squad car together, with St. Germaine driving. (Gatz Dep. at 26; Gilbert Dep. at 14; Dykas Dep. at 7; Friese Dep. at 21; St. Germaine Dep. at 24, 29.)

Defendant Dykas proceeded directly to Groesbeck from the Clinton Township Police Station and turned southbound when he saw a purple PT Cruiser in front of the Police Station traveling northbound. Making a U turn, he began to follow it. (Dykas Dep. at 9-10.) He advised dispatch that he was following the PT Cruiser, provided a license plate number, and activated his lights once another police unit had made his location. (Dykas Dep. at 11; Gatz Dep. at 42.) According to Defendant Dykas, once he activated his lights, the PT Cruiser turned into the parking lot of a Burger King and stopped. After Defendant Dykas stopped his vehicle, the PT Cruiser took off out of the parking lot. (Dykas Dep. at 12-13.) Defendant Dykas advised dispatch and pursued the PT Cruiser until the PT Cruiser turned into a parking lot in Mt. Clemens and stopped. (Dykas Dep. at 14-17; Gatz Dep. at 40-48; Gilbert Dep. at 18-22; St. Germaine Dep. at 30-39.) While engaged in the pursuit of the PT Cruiser, Clinton Township Defendants were informed by dispatch that the robber was armed with a black handgun. (Pl.'s Ex. 1, 911 DVD.) McCarty's PT Cruiser stopped in the Mt. Clemens Farmers Market parking lot. Clinton Township Defendants also drove their police cars into that parking lot, parking their squad cars in a semi-circle around McCarty's car, and assumed defensive positions behind their squad car doors. (Pl.'s Ex. 2, State Police Forensic Map; Pl.'s Ex. 3, photographs; Dykas Dep. at 17; Gatz Dep. at 48-52; St. Germain Dep. at 39; Gilbert Dep. at 22-24; Friese Dep. at 21.) Defendant Abdoo was also on the scene, having picked up the pursuit in the Burger King parking lot. (Abdoo Dep. at 15, 32-40.)

3

The Farmers Market parking lot has apartment buildings located on the east and west sides of the lot, approximately 95 yards apart. (Pl.'s Ex. 2, State Police Forensic Map.) Residents from those apartment buildings provided eye witness testimony of the events that occurred next.

### B. Testimony that McCarty Was Shot While Backing Up With His Hands in Air and Was Shot After He Laid Face Down on the Ground

#### 1. Jennifer Smith

Jennifer Smith testified that she watched the shooting unfold from her third floor apartment window looking directly down into the Farmers Market parking lot. She had an unobstructed view from her living room window. (J. Smith Dep. at 9, 18.) Her attention was drawn to the incident by the police emergency lights visible from her window. She could see the police cars and the PT Cruiser clearly. (*Id.* at 9-11.) The parking lot was well lit. (*Id.* at 54-55.) She saw the incident from the time McCarty got out of his car until the time the Clinton Township Defendants stopped shooting.

Ms. Smith testified as follows. McCarty got out of the PT Cruiser, turned in the direction of one officer and then began backing away with his hands in the air at a ninety degree angle with his hands pointed "almost like a surrender kind of." (J. Smith Dep. at 13-14, 20, 25-26, 42; J. Smith Dep. Ex. 2, sketch.) McCarty's arms were moving like a person gesticulating while talking, and he was stepping slowly backwards. (J. Smith Dep. at 13-14, 22, 45, 67-69.) The gestures did not appear threatening. (*Id.* at 85-87.) McCarty took at least four or five steps backwards. While he was still slowly backing up, Defendants opened fire. (*Id.* at 14, 44, 46.) McCarty remained standing for the first few shots and then fell down. (*Id.* at 46-47.) Defendants were behind their squad car doors during the

4

shooting.  (*Id.* at 41, 64, 76.)  Prior to the shooting, McCarty did not point anything at the police.  (*Id.* at 13-14.)  He did not turn toward the police and raise his arm as if he had a weapon.  (*Id.* at 20.)  He never lowered his arms while he was standing.  (*Id.* at 68.)

Ms. Smith further testified that, when McCarty was lying on the ground, she heard more shots.  (*Id.* at 15.)  After being shot and while he was on the ground, she saw him move slightly or twitch; just enough to indicate to her that he was still alive.  (*Id.* at 20-21, 48, 82-83.)  McCarty never pointed a weapon at the police while he was on the ground. (*Id.* at 21).

### 2. Delbert Mortimore

Delbert Mortimore, a retired insurance adjuster and one-time police officer, observed the incident from his apartment balcony on the fourth floor.  (Mortimore Dep. at 6, 11-12, 15.)  Defendants were still firing shots when he came out on his balcony.  (*Id.* at 19.)  When he observed McCarty, McCarty was already lying, chest down on the ground "down perhaps two car lengths, or maybe thirty-five or forty feet from the headlights of his car." (*Id.* at 20, 94, 116.)  McCarty was fully illuminated, and Mortimore could clearly see five or six footprints in the snow "leading from the left side of his car up to where his body was." (*Id.* 22-23, 25-32; Dep. Ex. 1, Mich. State Police drawing.)  Mortimore testified that he saw Defendants fire their guns into McCarty's body while he was lying on the ground and observed at least three bullets strike McCarty while he lay prone on the ground.  (Mortimore Dep. at 35-36, 58, 118-19.)

Mortimore further testified that McCarty displayed "no aggressive movement" and "no movement from – that I saw coming from that man.  I saw no aggressive movement, no – nothing," but Defendants "kept firing and firing and firing" for over thirty seconds.  (*Id.* at 56-

59, 37.)  The only movement Mortimore witnessed was that McCarty's left leg from the knee to the foot slowly rose up and then down.  (*Id.* at 43-44.)  At that point, he observed a laser gun "dancing around the side of this guy's body."  (*Id.* at 44-45, 90.)

When asked if it appeared that the officers were in danger, Mortimore answered:

> I don't know how they could have been in danger.  They were behind, or beside their cars.  The person that was down, if he was even facing – if his head was facing in their direction, it would have been looking into four sets of headlights, with them standing beside their cars.

(*Id.* at 116.)

### 3.  James Beck

Another apartment resident, James Beck, observed the shooting from the fifth floor of his apartment building.  The lighting was good, and Beck did not have a problem seeing. (Beck Dep at 20, 77.)  Beck saw and heard Defendants, who were approximately 75 to 100 feet away, fire four to six shots into a body lying face down on the ground.  (*Id.* at 15-18, 58-59.)  He saw McCarty's hands by his sides; not underneath him.  (*Id.* at 22, 45.)  While McCarty was lying face down on the ground and the officers were shooting at him, McCarty never pointed a gun or threatened them in any way.  (*Id.* at 80, 81-82.)  The only movement Beck saw from McCarty was slight, like twitching, and most likely involuntary.  (*Id.* at 18, 80-81, 84.)

Beck saw the impact from the bullets striking McCarty when he was on the ground:

> I saw his – I saw maybe his up – his right upper arm move, he was hit at least by a couple of shots, you could see his clothing move as he was prone, as he was laying, Mr. McCarty was laying, you could see the clothing move as the last shots hit him.

(*Id.* at 17.)  Beck testified that he heard the shots and saw McCarthy's clothing move simultaneously.  (*Id.* at 78-79.)

6

After the shooting stopped, Beck observed the events with a pair of binoculars. He saw Defendants approach McCarty, who was motionless. (*Id.* at 22, 27, 85.) When asked if McCarty appeared to be a threat at that time, Beck answered, "Well, I don't think anybody would consciously perceive that guy as being a threat at that point, but they were being very cautious." (*Id.* 48, 51.) When Defendants arrived at McCarty's body, one of them kneed him in the back. (*Id.* at 20, 25, 82.) Beck did not see a gun on the ground, did not see any officer sweep anything away from McCarty's body, and did not see any officer pick up or appear to pick up anything from the vicinity of McCarty's body. (*Id.* at 81.)

### 4. Alan Zerla

Another witness, Alan Zerla, testified that he observed parts of the incident. He testified that he saw Defendants fire eighteen to twenty times at a body that was lying on the ground over the course of one to three minutes. (Zerla Dep. at 12.) He did not observe McCarty point his arm at the officers and did not see McCarty with a weapon. (*Id.* at 61.)

### 5. Forensic Evidence

McCarty's body fell face down facing west, approximately 27 feet to the northwest of his parked PT Cruiser. (Pl.'s Ex. 2, Mich. State Police scaled map.) The medical examiner, Dr. Daniel Spitz, performed an autopsy and determined that McCarty suffered 19 gunshot wounds, which Dr. Spitz labeled A through S. (Med. Ex. Rpt. at 4-15.) Dr. Spitz testified that eight wounds that McCarty suffered were consistent with him being shot while he lay face down with his chest on the ground and his arms at his side.

Wound A is a gunshot to the left side of the back of McCarty's neck that traveled back to front and slightly upward. (Med. Ex. Rpt. at 5.) This wound is consistent with an officer

shooting McCarty from about two and one-half feet while he lay face down.  (Spitz Dep. at 12-15.)

Wound E is a gunshot would to the back of the right arm traveling right to left and continuing through his shoulder and into his neck.  (Med. Ex. Rpt. at 7; Spitz Dep. at 29-30.)

Wound H is a gunshot wound to the back of McCarty's left thigh traveling back to front, left to right and upward.  (Spitz Dep. at 40-41.)

Wound I is a graze wound of the left thigh traveling left to right, back to front and slightly upward.  (Med. Ex. Rpt. at 9; Spitz Dep. at 41-42.)

Wound J is a gunshot wound to the back of the left forearm traveling back to front and slightly upward.  (Med. Ex. Rpt. at 9; Spitz Dep. at 47.)

Wound L is a gunshot wound to the back of McCarty's left arm traveling left to right and back to front.  It exited the side opposite the elbow and re-entered McCarty's chest as gunshot wound S.  (Spitz Dep. at 54-57.)

Wound S is a gunshot wound in the left side of the chest traveling left to right, slightly back to front which injured McCarty's left lung, spleen and pancreas.  This would was potentially fatal.  (Med. Ex. Rpt. at 14-15; Spitz Dep. at 58-60.)

Wound M is a gunshot wound to McCarty's back with a sharp upward angle.  (Spitz Dep. at 61-62.)

Dr. Spitz also testified that three wounds were consistent with McCarty being shot with his hands and arms raised in the air.

8

Wound F is a gunshot wound to the right forearm.  (Spitz Dep. at 31, 37.)  Dr. Spitz observed that the wound is not consistent with McCarty pointing a gun at the officers. (Spitz Dep. at 34-35.)

Wound G is a gunshot wound of the front right wrist which exits the back of the right wrist.  (Spitz Dep. at 37, 39.)

Wound K is a gunshot wound of the back of the left wrist which traveled right to left and upward.  (Med. Ex. Rpt. at 10; Spitz Dep. at 47, 52.)

### C.  Conflicting Testimony From Defendants

Defendants' testimony conflicts with that above.

As indicated in the Michigan State Police map of the scene (Pl.'s Ex. 2), McCarty's PT Cruiser was parked facing northbound (angled slightly to the west) in a parking lot when the shooting occurred.  His body was found nearly 28 feet in front (north) and slightly to the left (west) of the car.  The police cars were positioned in a semi-circle behind (south) and flanking both sides of McCarty's vehicle.  (*Id.*)

#### 1.  Defendant Abdoo

Defendant Abdoo testified as follows.  When McCarty exited his vehicle, he took one step away from the vehicle westward and then turned towards Defendants.  (Abdoo Dep. at 40-42.)  McCarty then pointed what appeared to be a black, semiautomatic handgun with his arm straight out and with the magazine of the weapon pointing to the ground; a typical shooting position.  (*Id.* at 42-43.)  He heard gunshots and saw McCarty's gun hand move in a way that was consistent with the firing of a gun.  (*Id.* at 43-45.)  Abdoo did not fire his gun because a Clinton Township Defendant officer entered his line of fire.  (*Id.* at 47, 49-50.)  After Clinton Township Defendants opened fire, McCarty shuffled backwards a few

9

small steps with the gun in his hand.  He fell to the ground, bending first at the waist and falling forward with his shoulder area first.  (*Id.* at 56-59.)  The shooting stopped when McCarty bent over and fell to the ground on his shoulder.  (*Id.* at 59-60.)  McCarty's weapon ended up under his body.  (*Id.* at 60.)  Abdoo did not hear any gunshots or see any bullets strike McCarty after he fell to the ground.  (*Id.* at 61.)

### 2.  Defendant Dykas

Clinton Township Defendant Dykas testified that he pulled behind and just to the left (west) of McCarty's PT Cruiser when it stopped.  (Dykas Dep. at 17.)  Defendant Dykas opened his door and used it as cover as he pointed his gun at the PT Cruiser.  (*Id.* at 19.)  McCarty exited the car with a gun in his right hand.  McCarty took five or six steps to the west while turning his head to look at Defendant Dykas.  (*Id.* at 23-25.)  Dykas ordered McCarty to drop the weapon, and McCarty turned towards him and raised his right arm.  (*Id.* at 25-27.)  McCarty was 20 to 25 feet away at this time.  (*Id.* at 38.)  McCarty then aimed the gun at Dykas with his arm straight out and the magazine pointing towards the ground.  At this point, Defendant Dykas opened fire.  (*Id.* at 28.)  McCarty twisted and turned to the left and then to the right as he appeared to be hit by gunfire.  (*Id.* at 29.)  Dykas fired 9 shots over 3 to 5 seconds.  (*Id.* at 34.)  McCarty fell to the ground with his head facing the PT Cruiser.  (*Id.* at 31.)  McCarty did not point a gun at Dykas after he fell to the ground.  (*Id.* at 33.)  Dykas did not hear or see any bullets strike McCarty after he fell to the ground face down.  (*Id.*)

### 3.  Defendant Friese

Defendant Friese pulled his squad car just to the right (east) of McCarty's PT Cruiser.  He testified as follows.  McCarty stepped out of the car, took one step to the front of the car

10

and turned south towards Dykas and pointed a gun at him.  (Friese Dep. at 26-29, 35.)
McCarty then took a step backward.  (*Id.* at 27-28.)  Defendant Friese's view of McCarty
was obscured from the waist down by the PT Cruiser.  (*Id.* at 30.)  Defendant Friese heard
a gunshot and saw McCarty's hand recoil in an upward motion.  (*Id.* at 40-41.)  From his
position between the passenger door of the PT Cruiser and the driver's door of his squad
car, Defendant Friese also shot 9 times over the course of 3 to 5 seconds.  (*Id.* at 31-32,
42-43; Dep. Ex. 3, map.)  McCarty was walking backwards as the shots were fired, and he
fell just in front of the PT Cruiser.  (*Id.* at 45.)  When McCarty fell, he was lying on his right
side, still pointing a gun at Defendant Dykas.  Defendant Friese continued firing until
McCarty rolled over on his stomach, covering the gun.  (*Id.* at 33-35.)

### 4.  Defendant Gatz

Defendant Gatz was in the patrol car directly behind the PT Cruiser.  He testified that
McCarty exited his car and walked south towards Defendant Dykas with his arm held in a
firing position.  (Gatz Dep. at 55.)  Defendant Gatz told McCarty to drop the weapon.  (*Id.*
at 57.)  He then observed McCarty fire a shot at Defendant Dykas.  (*Id.*)  He heard the
crack of McCarty's gun shot and saw McCarty's wrist recoil or snap upward.  (*Id.* at 57-58.)
He saw a muzzle flash from McCarty's gun.  (*Id.* at 95.)  Defendant Gatz fired 8 shots in a
period of less than 10 seconds at McCarty's torso.  He did not fire at McCarty while he was
on the ground.  (*Id.* at 59-60.)  After McCarty was shot and on the ground, McCarty did not
move and did not respond to commands.  (*Id.* at 72.)  When Gatz and the other Defendants
approached McCarty's motionless body, Defendant Gatz pulled McCarty's right hand from
under his body and his hand was still holding a gun.  (*Id.* at 73-74.)

### 5.  Defendant St. Germaine

Clinton Township Defendant St. Germaine was driving a patrol car, and Defendant Gatz was his partner.  He testified that McCarty walked towards Defendant Dykas and raised a hand gun to a firing position.  (St. Germaine Dep. at 46, 48-49.)  St. Germaine fired 3 shots, then his gun jammed.  He cleared the jam.  McCarty was still facing Defendant Dykas and holding the gun in a firing position, so St. Germaine fired 7 or 8 more shots until his gun was empty.  (*Id.* at 54-58.)  He then reloaded.  McCarty was still facing Defendant Dykas and holding his gun in a firing position, so St. Germaine fired 1 more bullet.  (*Id.* at 59-60.)  McCarty immediately went down after this shot.  (*Id.*)

### 6.  Defendant Gilbert

Clinton Township Defendant Gilbert was the passenger in the squad car driven by Defendant Friese.  He fired 10 shots at McCarty.  The entire time he was firing, McCarty had his arm raised in a firing position and was facing Defendant Dykas.  (Gilbert Dep. at 31, 53.)

### D.  Testimony that McCarty was Tasered Twice After Shot and on Ground

Defendant Abdoo testified that, after McCarty was shot and lying on the ground, Abdoo observed him moving, but he was not responding to commands from other Defendant officers.  (Abdoo Dep. at 62-65.)  After a short time, Abdoo and Defendant Friese approached McCarty.  (*Id.* at 63.)  As the officers approached McCarty, Defendant Dykas observed that McCarty was having difficulty breathing, heard McCarty gasping for breath, but observed no other movement.  (Dykas Dep. at 41-42.)

Defendant Abdoo had his taser gun drawn as he approached McCarty.  (Abdoo Dep. at 63.)  As he approached toward McCarty's feet, Abdoo could see wounds in various parts of McCarty's body and could see bloodstains in the snow.  (*Id.* at 66.)  He called out to

12

McCarty but received no response. (*Id.*) McCarty's legs and arms were moving, but McCarty was not moving from his location. (*Id.* at 67.)

When Defendant Abdoo got to within 10 feet of McCarty's body, he tasered him for about five seconds. About 12 seconds later, Abdoo tasered McCarty a second time for five seconds. (*Id.* at 63, 67, 69-70-71.) Each time he tasered McCarty, Defendant Abdoo observed visible signs of McCarty's body responding to the taser.

> Q: Okay. Now when you tasered Mr. McCarty the first time, did he have a physical response to the tasering?
> A: I – well, his response was that there wasn't a lot of movement. Tightened up muscles.
> Q: Okay.
> A: Major muscle groups.
> Q: Have you had – you're certified in taser, correct?
> A: I'm certified to carry a taser.
> Q: Okay. Have you had the opportunity to see a person tasered before?
> A: Yes.
> Q: And did – was Mr. McCarty's reaction consistent with a person being tasered that you've witnessed?
> A: Yes.
>
> \* \* \*
>
> Q: When you tasered him the second time did he have a response?
> A: The same response as the first.

(*Id.* at 70-71.) Other Clinton Township Defendants similarly testified that McCarty's body had a visible reaction to the taser. (Dykas Dep. at 40-41, "His body tensed up;" St. Germaine Dep. at 72-73, "He jerked;" Friese Dep at 58-59, "the body shook a little bit.")

Defendant Abdoo testified that, after McCarty was tasered, Clinton Township Defendant officers slid his weapon out from underneath him and then placed him in handcuffs. (Abdoo Dep. at 72.)

## II.  Summary Judgment Standard

13

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

Defendants argue in their motions that they are entitled to qualified immunity. In a very recent decision, the Sixth Circuit addressed a similar argument in the context of a § 1983 excessive force case. *See Grawey v. Drury*, Nos. 07-2584, 08-1064, ___ F.3d ___,

14

2009 WL 1479017 (6th Cir. May 28, 2009). It began, as this Court does, with a discussion of the doctrine of qualified immunity and how the Court determines whether a defendant is entitled to the protection afforded by that doctrine.

The doctrine of qualified immunity shields "'government officials performing discretionary functions'" from "'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at * 3 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). On summary judgment, the Court is required to view the facts in the light most favorable to the non-moving party; Plaintiff in this case. Viewing the facts in that light, the Court must then determine "whether: 1) the violation of a constitutional right has occurred; and 2) the constitutional right at issue 'was clearly established at the time of defendant's alleged misconduct." *Grawey v. Drury*, 2009 WL 1479017 at *3 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and citing *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004)). In an excessive force case, these are the only two steps in the Court's analysis. *Grawey v. Drury*, 2009 WL 1479017 at *3. Although the Supreme Court, in *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808, 818 (2009), recently held that the courts now have discretion to address the second step first when appropriate, this Court, similar to the Sixth Circuit in *Grawey v. Drury*, will first examine whether Plaintiff "has presented evidence of an excessive force constitutional violation and then whether the constitutional violation was clearly established at the time of the incident." 2009 WL 1479017 at *4.

"In step one of the qualified immunity analysis, the court determines whether this evidence, produced by plaintiff, taken in the light most favorable to plaintiff but viewed from the perspective of a reasonable officer on the scene, establishes a claim of excessive force

15

in violation of the Constitution." *Id.* If an excessive force claim is established, the Court proceeds to the second step. At this step, the Court must determine whether the violated constitutional right was clearly established at the time of the alleged misconduct. *Id.*

Plaintiff alleges three instances of excessive force in violation of the Fourth Amendment: (1) that Clinton Township Defendants used excessive force when they shot McCarty while he was walking backward with his hands held up in the air; (2) that Clinton Township Defendants used excessive force when the shot McCarty as he lay face down on the ground; and (3) that Defendant Abdoo used excessive force when he tasered McCarty two times as he lay face down on the ground after being shot.

### A. Use of Deadly Force

The Court first examines Clinton Township Defendants' use of deadly force when they initially shot McCarty and, viewing the facts in the light most favorable to Plaintiff, when he was subsequently shot while lying face down on the ground.

### 1. General Principles

As the Supreme Court observed in *Tennessee v. Garner*, "apprehension by use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." 471 U.S. 1, 7 (1985). The Sixth Circuit "assesses the reasonableness of a seizure in distinct stages." *Bouggess v. Mattingly*, 482 F.3d 886, 889 (6th Cir. 2007). "[W]hether the use of deadly force at a particular moment is reasonable depends primarily on objective assessment of the danger a suspect poses at the moment. The assessment must be made from the perspective of a reasonable officer in the defendant's position." *Id.* "That objective assessment" of the danger the suspect posed at the moment deadly force was used "requires asking whether the officer has probable cause to believe that the

16

suspect poses a threat of serious physical harm, either to the officer or to others."  *Id.*
(internal quotation marks and citation omitted).   When applying this "probable cause"
standard, the Sixth Circuit considers the following non-exhaustive factors:  "(1) the severity
of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of
the officers or others; and (3) whether the suspect is actively resisting arrest or attempting
to evade arrest by flight."  *Id.*  The officer's belief that the suspect possesses a weapon is
not enough to justify the use of deadly force.  *Id.* at 896.  As the Sixth Circuit explained,
"even when a suspect has a weapon, but the officer has no reasonable belief that the
suspect poses a danger of serious physical harm to him or others, deadly force is *not*
justified."  *Id.* (citing cases).

### 2.  Plaintiff's Version of Facts Shows a Constitutional Violation

Viewing the facts in the light most favorable to Plaintiff, Clinton Township Defendants
lacked probable cause to believe that McCarty posed a serious threat of danger to them
or to the public when he was initially shot.  First, even though Defendants knew McCarty
was a suspect in an armed robbery, there was no report that anyone had been physically
injured during that robbery.   Second, even though McCarty had earlier fled from
Defendants, there is witness testimony that, when confronted by the police in the Farmers
Market parking lot, he was shot while moving backward with his hands raised in the air
above his head.  Jennifer Smith testified that McCarty's gestures were not threatening, that
he never pointed anything at the police, and never lowered his arms while he was standing.
Ms. Smith's testimony that McCarty took five steps back away from Defendants is
corroborated by Mr. Mortimore's testimony that he saw five or six footprints in the fresh
snow leading to McCarty's body.  Ms. Smith's testimony that McCarty was shot while his

arms were in the air is corroborated by the Medical Examiner's testimony concerning three of his wounds.

Viewing the facts in the light most favorable to Plaintiff, Clinton Township Defendants also lacked probable cause to believe that McCarty posed a serious threat of danger to them or to the public when they continued to shoot him while he laid face down on the ground. Jennifer Smith testified that, although McCarty never pointed a weapon at Defendants or made any threatening movements while lying on the ground, she heard Defendants continue to fire shots at him. Delbert Mortimore testified that he saw Defendants fire their guns into McCarty's body while he was lying on the ground and saw at least three bullets strike his body. Mr. Mortimore did not perceive Defendants to be in danger, and testified that McCarty was shot even though he displayed no aggressive movements. James Beck, another apartment resident, testified that he saw McCarty's hands by his sides; not underneath him. He also saw Defendants shoot him while he was lying face down on the ground even though McCarty never pointed a gun at Defendants or threatened them in any way. Mr. Beck saw McCarty's clothing move as the shots hit him. This testimony, that McCarty was shot in the back while lying face down on the ground, is corroborated by the Medical Examiner who testified that several of the wounds were consistent with McCarty being shot in this manner.

Taking the evidence in the light most favorable to Plaintiff but viewed from the perspective of a reasonable officer on the scene, Plaintiff's evidence establishes an excessive force claim as to Clinton Township Defendants' use of deadly force. Plaintiff, however, must also satisfy the second step of the qualified immunity analysis by showing

18

that McCarty's Fourth Amendment rights were clearly established at the time he was shot. *Grawey v. Drury*, 2009 WL 1479017 at *4.

### 3.  McCarty's Constitutional Rights Were Clearly Established

"The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.  To determine whether a constitutional right is clearly established, this Court looks "first to decisions of the Supreme Court," then to decisions of the Sixth Circuit, "and finally to decisions of other circuits." *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005).  "[T]here need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional." *Id.* (internal quotation marks and citations omitted).

Viewing the facts in the light most favorable to Plaintiff, no reasonable officer could have thought that he had probable cause to use deadly force against McCarty.  Based on the case law that existed on January 27, 2007, when McCarty was shot, Clinton Township Defendants were on notice that their actions were unconstitutional.  "[T]he Supreme Court has recognized that there are obvious cases in which an officer should have been on notice that his conduct violated constitutional rights, despite the generalized nature of that Court's pronouncements of constitutional standards." *Bouggess*, 482 F.3d at 895.  Moreover, the Sixth Circuit established, in *Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996), that despite "uncontroverted evidence of serious danger to officers stemming from the suspect's clear possession of a weapon, his recent firing of his weapon, and his threatening language toward the police," the officers were not entitled to qualified immunity because

19

immediately before the shooting, "it was disputed whether the suspect was non-threatening *when he was shot.*" *Bouggess*, 482 F.3d at 895. Here too, it is disputed whether McCarty was a threat to the police or others when he was shot initially and when he was lying face down on the ground.

### B. Use of Taser on McCarty Twice While Face Down on Ground

It is not disputed that Defendant Abdoo tasered McCarty two separate times while he was lying face down on the ground. Viewing the evidence presented here in the light most favorable to Plaintiff, Abdoo's use of force was excessive and violated McCarty's Fourth Amendment rights.

### 1.  General Principles

This Court's task is to evaluate Defendant Abdoo's repeated tasering of McCarty "'under the Fourth Amendment's 'objective reasonableness' standard.'" *Roberts v. Manigold*, 240 F. App'x 675, 677 (6th Cir. 2007) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 197 (2004)). Under the Fourth Amendment, a police officer may use only such force as is objectively reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989). Determining whether there has been a Fourth Amendment violation requires consideration of the same non-exclusive list of three factors discussed above. *Id.* at 396. Defendant Abdoo's use of force, when viewed in the light most favorable to Plaintiff, is balanced against McCarty's Fourth Amendment right to be free from excessive force. *See id.* at 396. Moreover, "[t]he type of weapon used is not the issue; the excessiveness of the force is the Fourth Amendment inquiry." *Roberts*, 240 F. App'x at 678 n.4 (distinguishing the same three decisions Defendant relies on here, *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004); *Hinton v. City of Ellwood*, 997 F.2d 774, 781 (10th Cir. 1993); and

20

*Francis v. Pike County*, 875 F.2d 863 (6th Cir. 1989) (unpublished), because "none of these cases concern tasering as gratuitous force, but rather only the use of tasers in tense situations.").

Recent Sixth Circuit decisions guide the Court's inquiry about the objective reasonableness of Defendant Abdoo's use of force.  *See Roberts*, 240 F. App'x at 677 (citing cases).  It is unconstitutional to use force on a suspect that is already subdued.  *See Baker v. City of Hamilton*, 471 F.3d 601, 608 (6th Cir. 2006) (observing that "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.")  Plaintiff claims here that Defendant Abdoo needlessly tasered McCarty two times within a short interval.

### 2.  Plaintiff's Version of Facts Shows a Constitutional Violation

Viewing the facts in the light most favorable to Plaintiff, from the point McCarty fell face down on the ground, he posed no threat of serious danger to Defendants or to the public.  As Defendant Abdoo approached McCarty, there is testimony that he did not point a gun at Defendants, was not attempting to escape, and was not making threatening gestures toward Defendants.  Defendant Abdoo testified that he could see that McCarty was wounded in various places and could see bloodstains in the snow.  There is testimony that, as Abdoo approached McCarty, McCarty could be heard gasping for breath and having difficulty breathing.  There is ample testimony that, immediately before Defendant Abdoo tasered him, any movement from McCarty  was involuntary and more like twitching.  Abdoo testified that, although he witnessed McCarty's body respond to his initial tasering, he tasered him again.  During the interval between the first and second tasering, Defendant Abdoo testified that McCarty did not move and yet he tasered him again.

21

### 3. McCarty's Constitutional Rights Were Clearly Established

As the Sixth Circuit recently observed, "[t]he general consensus among our cases is that officers cannot use force . . . on a detainee who has been subdued, . . . or is not resisting arrest." *Grawey*, 2009 WL 147901 at *9 (citing cases).  Viewing the evidence in the light most favorable to Plaintiff, and based on the caselaw that existed on the date of the alleged use of excessive force, Defendant Abdoo "was on notice that his actions were unconstitutional." *Id.*  Similar to the pepper spraying at issue in *Grawley*, "a reasonable office would know" that using a taser on a suspect who has been subdued by multiple gunshot wounds, is not resisting arrest and is lying motionless and face down on the ground and, as a result "is no danger to anyone constitutes excessive force." *Id.*  To taser McCarty a second time under these circumstances "is an obvious constitutional violation that does not require a specific body of caselaw to be clearly established." *Id.* (citing *Brousseau*, 543 U.S. at 199).

## IV. Conclusion

For the above stated reasons, Defendants' motions for summary judgment are DENIED.


                    s/Nancy G. Edmunds_____
                    Nancy G. Edmunds
                    United States District Judge

Dated:  June 15, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 15, 2009, by electronic and/or ordinary mail.

                    s/Carol A. Hemeyer_____
                    Case Manager

22